No. 19-30665

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

VINCENT FUSILIER, SR., Reverend; LIONEL MYERS; WENDELL
DESMOND SHELBY, JR.; DANIEL TURNER; TERREBONNE PARISH
BRANCH NAACP,
*Plaintiffs-Appellees,*

v.

JEFFREY MARTIN LANDRY, Esq.,
Attorney General for the State of Louisiana, in his official capacity,
*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

_____

## PLAINTIFFS-APPELLEES' PETITION
## FOR REHEARING EN BANC

_____

LEAH C. ADEN
JANAI S. NELSON
SAMUEL SPITAL
NAACP Legal Defense and
 Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
laden@naacpldf.org

MICHAEL DE LEEUW
WILLIAM A. LESSER
Cozen O'Connor
45 Broadway, 16th Floor
New York, NY 10006
(212) 908-1131
mdeleeuw@cozen.com
wlesser@cozen.com

*Additional Counsel Listed on Inside Cover*

MICHAELE N. TURNAGE YOUNG
NAACP Legal Defense and
 Educational Fund, Inc.
700 14th Street NW, Suite 600
Washington, D.C. 20005
(202) 216-5567
mturnageyoung@naacpldf.org

RONALD L. WILSON
701 Poydras Street, Ste. 4100
New Orleans, LA 70139
(504) 525-4361
cabral2@aol.com

*Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of the case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Private Plaintiffs-Appellees | Former or Current Counsel |
|---|---|
| • Terrebonne Parish Branch NAACP<br>• Rev. Vincent Fusilier, Sr.<br>• Lionel Myers<br>• Daniel Turner<br>• Wendell Desmond Shelby, Jr. | • Leah C. Aden<br>• Cozen O'Connor<br>• Michael de Leeuw<br>• Ryan P. Haygood<br>• Natasha M. Korgaonkar<br>• William Lesser<br>• Danielle Morello<br>• Janai S. Nelson<br>• NAACP Legal Defense & Educational Fund, Inc.<br>• Deuel Ross<br>• Alexander Selarnick<br>• Samuel Spital<br>• Michaele N. Turnage Young<br>• Ronald L. Wilson<br>• Victorien Wu |
| **Former or Current Defendant-Appellant** | **Former or Current Counsel** |
| • Jeffrey Martin Landry, in his official capacity as the Attorney General of the State of Louisiana<br>• James D. Campbell, in his official capacity as the Attorney General of the State of Louisiana | • William P. Bryan, III<br>• Madeline S. Carbonette<br>• Angelique Duhon Freel<br>• Phillip M. Gordon<br>• Holtzman Vogel Josefiak Torchinsky PLLC<br>• LaToya Danielle Jordan |

| | |
|---|---|
| | • Louisiana Department of Justice<br>• Suzanne Quinlan Mooney<br>• Elizabeth Murrill<br>• Office of the Attorney General of the State of Louisiana<br>• Theresa Cassidy Phillips<br>• Jessica Marie Podewils Thornhill<br>• Dennis W. Polio<br>• Jason Brett Torchinsky<br>• Jeffrey M. Wale<br>• Patricia Hill Wilton |
| **Former of Current Defendant at District Court** | **Former or Current Counsel** |
| • John Bel Edwards, in his official capacity as the Governor of the State of Louisiana<br>• Piyush "Bobby" Jindal, in his official capacity as the Governor of the State of Louisiana | • Matthew Block<br>• Office of the Governor of the State of Louisiana |
| • Tom Schedler, in his official capacity as the Louisiana Secretary of State | • Celia R. Cangelosi<br>• Carey T. Jones |
| **Proposed Defendant Intervenor at District Court** | **Former or Current Counsel** |
| • Terrebonne Parish Consolidated Government | • Julius P. Hebert, Jr. |

/s/ *Leah C. Aden*
Leah C. Aden

*Counsel for Plaintiffs-Appellees,*
*Rev. Vincent Fusilier, Sr., et al.*

## STATEMENT REGARDING EN BANC REVIEW

En banc review is necessary to ensure the uniformity of this Court's decisions because the panel decision below contains errors that are directly at odds with Supreme Court and this Court's precedent. In this voting rights case, the panel failed to determine the threshold justiciability issue of whether Louisiana's Attorney General ("AG")—*the only appealing defendant*—was a proper party. Throughout this litigation, the AG vehemently denied that he was a proper party. In these circumstances, the panel was required first to determine whether the AG was a proper party, and thus whether the Court had jurisdiction to review the district court's merits decision. The panel clearly erred by failing to do so. The error is particularly significant because Judge Duncan concurred in the judgment, but would have held that the AG was an improper party. This issue is critical because Louisiana's Governor, the other defendant at trial, chose not to appeal the district court's rulings.

The panel's decision includes an additional error that conflicts with Supreme Court and this Circuit's precedent. The panel committed legal error by failing to recognize that the "Senate Factors" used to assess the "totality of circumstances" of racial discrimination in a Section 2 Voting Rights Act ("Section 2") case are non-exhaustive and no set number need be proven. The panel improperly discounted the overwhelming "totality of the circumstances" evidence established at trial and failed

even to acknowledge significant evidence about the persistence of racial discrimination in Terrebonne Parish elections. That specific evidence includes the re-election of a sitting white judge in 2008 under the electoral system at issue—*after* the Louisiana Supreme Court suspended him for appearing in public "dressed as a prisoner, wearing an orange jumpsuit, handcuffs, a black afro wig, and black makeup on his face, which he decided to apply after his costume did not 'generate the laughs [he] had expected.'" ROA.29327. Relying on the evidence, the district court found that Plaintiffs established a substantial case of vote dilution, and the panel failed to apply the proper standard of clear error review in substituting its judgment for that of the district court.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .......................................................... i

STATEMENT REGARDING EN BANC REVIEW ............................................. iii

STATEMENT OF ISSUES ...................................................................................1

STATEMENT OF THE COURSE OF PROCEEDINGS ........................................1

STATEMENT OF FACTS ....................................................................................3

ARGUMENT ......................................................................................................8

   I.   Review Is Necessary to Maintain the Uniformity of This Court's Decisions Because the Panel's Opinion Does Not Adhere to This Court and the Supreme Court's Precedent ....................................................................................8

     A.  The Panel Failed to Determine Whether the AG Was a Proper Party as It Was Required to Do Under Supreme Court and Fifth Circuit Precedent. ..........8

     B.  The Panel Misapplied Well-Settled Law in Its "Totality of Circumstances" Analysis ...............................................................................................12

CONCLUSION ..................................................................................................16

CERTIFICATE OF COMPLIANCE ...................................................................17

CERTIFICATE OF SERVICE .............................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anthony v. Petroleum Helicopters, Inc.*, 693 F.2d 495 (5th Cir. 1982)...................12

*Bone Shirt v. Hazeltine*, 461 F.3d 1011 (8th Cir. 2006) ..........................................14

*Cabral v. City of Evansville*, 759 F.3d 639 (7th Cir. 2014).....................................11

*Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496 (5th Cir. 1987) ................................................................................................................13

*Clark v. Calhoun Cty.*, 88 F.3d 1393 (5th Cir. 1996).............................................13

*Cooper v. Texas Alcoholic Beverage Com'n*, 820 F.3d 730 (5th Cir. 2016) .......................................................................................................................11,12

*Fotenont v. McCraw*, 777 F.3d 741 (5th Cir. 2015) ..................................................9

*Hollingsworth v. Perry*, 570 U.S. 693 (2013)......................................................9, 12

*Hotze v. Burwell*, 784 F.3d 984 (5th Cir. 2015)......................................................11

*In re Ellender*, 889 So.2d 225 (La. 2004)..................................................................4

*June Med. Services L.L.C. v. Russo*, 2020 WL 3492640 (2020) .............................15

*K.C. ex rel. Africa H. v. Shipman*, 716 F.3d 107 (4th Cir. 2013) ...........................11

*McMillan v. Escambia Cty.*, 748 F.2d 1037 (5th Cir. 1984) .............................13, 14

*Miss. State Chapter, Operation Push v. Allain*, 674 F. Supp. 1245 (N.D. Miss. 1987), *aff'd*, 932 F.2d 400 (5th Cir. 1991) .....................................13

*NAACP v. Gadsden Cty. Sch. Bd.*, 691 F.2d 978 (11th Cir. 1982).........................14

*Natl. Fedn. of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ....................................9

*Paterson v. Texas*, 308 F.3d 448 (5th Cir. 2002).........................................9, 10, 12,

*Singh v. RadioShack Corp.*, 882 F.3d 137 (5th Cir. 2018) .........................................9

*Steel Co. v. Citizens for a Better Env't,*
523 U.S. 83 (1998) ...............................................................................................9

*Thornburg v. Gingles*, 478 U.S. 30 (1986) .......................................3, 12, 13, 14, 15

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) .......................................................13

*Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d
1109 (5th Cir. 1991) .....................................................................................12, 13

## STATEMENT OF ISSUES

1. Whether the panel erred in reversing an injunction against Louisiana's Governor when the Governor did not appeal, and the panel did not address whether the only appealing defendant, Louisiana's AG, was properly sued before reaching the merits of the case.

2. Whether the panel erred by failing to recognize that the Senate Factors are non-exhaustive and no set number need be established, and, in so doing, improperly substituted its own judgment for the trial court's factual determination of the "totality of circumstances" and compounded that error by ignoring key evidence about the persistence of racial discrimination in Terrebonne elections.

## STATEMENT OF THE COURSE OF PROCEEDINGS

In February 2014, Plaintiffs filed suit in the Middle District of Louisiana, challenging the at-large electoral method for the 32nd Judicial District Court ("32nd_JDC"). They named Louisiana's Governor and AG as defendants in their official capacities. ROA.61. Throughout the case, the AG argued that he was an improper party, repeatedly proclaiming that he was "impotent" and disclaimed that he played any role in Louisiana's judicial elections and, specifically, 32nd_JDC elections. *See*, *e.g*., ROA.29084; ROA.29270-71; ROA.29315.

In 2017, Judge James Brady held an eight-day bench trial, with 27 witnesses, including seven experts. After trial, Judge Brady entered judgment in a 91-page

1

decision, finding that at-large voting for Louisiana's 32nd_JDC violates Section 2 and the Constitution. ROA.29313-14; ROA.30553. In 2019, Chief Judge Rachelle Dick (to whom the case had been reassigned following Judge Brady's death) enjoined defendants from "administering, implementing, or conducting" at-large voting for the 32nd_JDC and ordered them to "take all steps necessary to implement" a court-drawn remedial plan. ROA.30532. ROA. 30555. The Governor chose not to appeal. The AG, who does not represent the Governor in this case, was the only defendant to appeal either the finding of Section 2 liability or the remedy.

A panel majority held that "plaintiffs plainly had standing to maintain suit *against Louisiana's Governor*." Op. at 5 (emphasis added). But the panel declined to rule on the AG's argument that he was an improper party. *Id*. at 28-29 nn.1 & 2.

The panel then turned to the merits. It held that Plaintiffs failed to overcome Louisiana's substantial "linkage" interest in at-large voting for the 32nd_JDC with substantial proof of vote dilution. *Id*. at 18. In ruling that Plaintiffs only established "marginal" vote dilution, the panel faulted Plaintiffs for failing to establish *one* of the many "Senate Factors," "Senate Factor 6," which is the existence of overt or subtle racial campaign appeals in Terrebonne elections. *Id*.

The panel also stated that Plaintiffs failed to show they could remedy the claimed vote dilution by creating a subdistrict in which the Black voting-age population ("VAP") met defendants' experts' numerical target of 56%, even if

2

Plaintiffs could establish the necessary liability preconditions under *Thornburg v. Gingles*, 478 U.S. 30 (1985). Op. at 19. However, the remedial sub-district (drafted by the court's own expert) contained an opportunity district with a 56% Black registered voter population which, among other evidence, is a plausible indicator of the remedial district's potential effectiveness than if simply based on the percentage of eligible Black voters. ROA.30192.

## STATEMENT OF FACTS

Louisiana has used at-large voting for the 32nd_JDC since it was created in 1968 with territorial jurisdiction over Terrebonne Parish. ROA.2935; ROA.29323. To date: <u>no</u> Black candidate has been elected (a) to the 32nd_JDC in a contested election, (b) to any other parish-wide elected office such as Parish President, District Attorney, Sherriff, Coroner, Clerk of Court, Tax Assessor, City Marshall, and Houma City Court Judge, and (c) outside of majority-Black subdistricts or ward-drawn districts. ROA.29321; ROA.29373; ROA.29013.

Most recently, in 2014, a Black female lawyer ran for the Houma City Court, which exercises the same concurrent territorial jurisdiction as the 32nd_JDC. ROA.28973. She ran as a Republican against two white male Republicans and came in third place, after receiving only 8% of white voter support, *but 85% of Black voter support*. ROA.28973. This was not unique to this election. The trial court heard extensive evidence that this pattern has persisted over a 20-year period and the

candidates preferred by Black voters have been defeated repeatedly and resoundingly in at-large elections, regardless of whether they have run for judicial or non-judicial offices, or local, state, or federal office, or the partisan affiliation of the candidates. ROA.29356. An expert in such racially polarized voting ("RPV") patterns, who had testified in 100 voting rights cases, stated at trial that "the magnitude of [racial] polarization [in this case]… would certainly be among the most polarized context or environment … if not the most" that he had ever examined. ROA.29356 & n.233; ROA.28971 n.51.

By stark contrast, a white sitting judge (Timothy Ellender) was reelected—over the staunch opposition of Terrebonne's Black community—even after the Louisiana Supreme Court suspended him for wearing blackface, an afro-wig, a prison jumpsuit, and handcuffs at a "costume party" held in a restaurant where members of the general public were also present. ROA.29327. Judge Ellender was accompanied by his wife, who was dressed as a police officer, and his brother in-law, who dressed as Buckwheat. ROA.30665 (referencing *In re Ellender*, 889 So.2d 225, 227 (La. 2004)).

After nearly 20 years of seeking legislative remedies (in vain), Plaintiffs brought suit in 2014, claiming that the at-large electoral system for the 32nd_JDC diluted their vote and Louisiana maintained at-large voting for that purpose. ROA.29313; ROA.28932 n.2. After extensive discovery and trial, the district court

found Plaintiffs satisfied the *Gingles* three pre-conditions for establishing liability. ROA.29329-62. This includes the first pre-condition that Plaintiffs showed the ability to draw a hypothetical district in which Black voters are comprised of the majority of the VAP. ROA.29329-51. The district court also found, thought it was not required to conduct this analysis, that the hypothetical plan could be effective for Black voters. ROA.29345-46 & n.187. As above, the district court found that Plaintiffs' satisfaction of the other two *Gingles* pre-conditions, RPV, in Terrebonne's elections weighed "overwhelmingly in favor of a finding of vote dilution." ROA.29367.

Turning to the totality of circumstances, the district court found—after hearing all of the evidence—that seven of the nine relevant, non-exhaustive "Senate Factors" ("SFs") were present. ROA.29363-88. Specifically, the district court found Plaintiffs established:

- SF 1: an extensive history of voting discrimination in Louisiana and Terrebonne, and a centerpiece of that history has been the use and maintenance of at-large voting. ROA.29364-67.

- SF 2: a stark pattern of RPV in Terrebonne's judicial and non-judicial elections. ROA.29367.

- SF 3: multiple election practices for the 32nd_JDC, such as a majority-vote requirement, division/numbered posts, and large election districts, enhance the likelihood of discrimination in Terrebonne. ROA.29367-69.

- SF 5: a history of *de jure* and *de facto* discrimination against Black people in every aspect of economic and social life in Louisiana and Terrebonne that has resulted in stark disparities between Terrebonne's Black and white residents in all important measures of socio-economic well-being. ROA.29369-72.

- SF 7: a "consistent pattern of black electoral defeat over many years and for many positions." ROA.29372-82.

- SF 8: the Black community's persistence in seeking an opportunity subdistrict and the Legislature and white judges' adamant persistence in thwarting those efforts. ROA.29382-83.

Based on these facts, the district court found that *even if* the court were to hold that Louisiana has a "substantial linkage interest" in at-large voting for the 32nd_JDC that substantial linkage interest "*would not outweigh a finding of vote dilution in this case, as the Plaintiffs have introduced substantial proof of vote dilution*." ROA.29384 (emphasis added).

After providing defendants "ample" opportunities to correct the violations, the district court ordered the use of a court-drawn remedial plan, developed in

conjunction with a court-appointed special master. ROA.29504-06; ROA.30532; ROA.30521-23. That plan essentially combined two preexisting majority-Black districts from which Black voters had elected their candidates of choice for the nine-member Parish Council into a majority-Black district for the five-member 32nd_JDC. ROA.30192-93.

The special master considered the effectiveness of the remedial district after examining registration and turnout statistics. ROA.30192-93. The Black VAP and registered voter population in that district are 50.4% and 56% respectively. ROA.30208.

The Governor chose not to appeal either the liability or remedial decisions.

The AG appealed, arguing that he and the Governor were improper defendants because neither had (1) any connections to judicial elections in Terrebonne Parish specifically or in Louisiana as a whole, and (2) the ability to carry out the district court's relief. Br. of Appellant at 24-29.

On appeal, the panel reversed the district court's liability and remedial rulings.

First, the panel held that Plaintiffs had properly named the *Governor* as a defendant. Op.at 5.[1] The panel *did not address* whether the AG—the only party to appeal—was a proper defendant. *Id*. at 28-29 nn.1 & 2.

---

[1] The majority reasoned that Louisiana's Governor is a proper party because he: "has been a party defendant in nearly all of Louisiana's voting rights cases challenged judicial district"; "as chief executive, he plays a pivotal role in the enactment of legislation that could address any federal

Second, the panel concluded that Plaintiffs established only a "marginal" case of vote dilution, insufficient to overcome Louisiana's linkage interest. *Id*. at 18. In reaching that conclusion, the panel emphasized the lack of evidence concerning a single Senate Factor, racial campaign appeals. *Id*. The opinion does not mention key evidence showing the manner in which race still functions in Terrebonne elections.

Third, the panel ruled that any claimed vote dilution could not be remedied effectively: i.e., that Plaintiffs could not show that a remedial district could be created with a 56% Black VAP, *Id*. at 19-20, a numerical threshold defendants' expert deemed necessary. The record evidence showed that Black registered voters constitute 56% of the court-drawn remedial district. ROA.30208.

## ARGUMENT

I.   **Review Is Necessary to Maintain the Uniformity of This Court's Decisions Because the Panel's Opinion Does Not Adhere to This Court and the Supreme Court's Precedent**

   A. **The Panel Failed to Determine Whether the AG Was a Proper Party as It Was Required to Do Under Supreme Court and Fifth Circuit Precedent.**

---

judgment"; and as a representative of Louisiana could "prescribe [a constitutional plan] before proceeding with elections." Op. 5 & n.3. Moreover, as the record indicates, he can call a special election for any vacancies created on the 32nd_JDC and no 32nd_JDC judge can take office until he signs the commission. Br. of Appellees at 32. This latter obligation is not purely ministerial; the Governor cannot sign a commission for a judge to take office in an unconstitutional manner, such as under an illegal at-large voting system. *Compare id*. *with* Op. at 28 n.2.

The Supreme Court has made clear that standing "must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013). While the panel recognized it must assess standing at all phases of the litigation, Op. at 5 (citing *Fotenont v. McCraw*, 777 F.3d 741, 747 (5th Cir. 2015)), the panel majority failed to do so. The panel was required to assess whether the AG—as the sole appellant— satisfied the Article III standing requirements of injury-in-fact, traceability, and redressability. Judge Duncan made clear that the majority failed to do. Op. at 28 & nn. 1 & 2 (citing Fifth Circuit cases); *see also Hollingsworth*, 570 U.S. at 706.

Moreover, the law is clear that the panel was required to resolve jurisdictional issues before adjudicating the merits. *Paterson v. Texas*, 308 F.3d 448, 450-51 (5th Cir. 2002) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–94 (1998), holding that federal courts should not assume jurisdiction over a claim and then reject it on the merits, but should decide jurisdiction first)); *see also Singh v. RadioShack Corp.*, 882 F.3d 137, 150-51 (5th Cir. 2018); *Natl. Fedn. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 543 (2012) ("Before turning to the merits, we need to be sure we have the authority to do so."); *Hollingsworth*, 570 U.S. at 704-05 ("In light of this 'overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere, we must put aside the natural urge to proceed

directly to the merits of [an] important dispute and to 'settle' it for the sake of convenience and efficiency.'").

Throughout this case, the AG vehemently argued that he was an improper party. *See*, *e.g*., ROA.3956-58 (in moving to dismiss); ROA.27659-66 & n.2; ROA.28029-030, 28033-34 (in pre-trial briefing); ROA.290842 (in post-trial briefing); ROA.29844-46 (during the remedial phase); Br. of Appellant at 21-29 (on appeal).

Plaintiffs' consistent position was that both defendants were properly sued. *See*, *e.g*., ROA.21869-871 (in defending against a motion to dismiss); ROA.28934-38 (in post-trial proceedings); Br. of Appellees at 29-35 (on appeal).

While the majority agreed that "plainly" the Governor was a proper party, as Judge Duncan criticized in his opinion, the majority completely failed to rule on whether the AG—the only defendant to appeal—was properly sued. Op. at 5, 28-29 & nn.1 & 2. Judge Duncan specifically agreed with the AG that he was an improper party because the AG lacks the authority to "'administer, implement, or conduct' [judicial] elections or to 'ensure' how future elections will take place." *Id*. at 30.

If the AG—as he argued—was not a proper party and has no connection to the electoral scheme at issue, then this Court lacked jurisdiction to reach the merits. Absent jurisdiction, the Court should have dismissed the AG's appeal, *Paterson*, 308

F.3d at 451, or—at most—vacated the portion of the injunction binding the AG. Op. at 33 (citing *Hotze v. Burwell*, 784 F.3d 984, 1000 (5th Cir. 2015)).

Moreover, the Court lacked jurisdiction to address the merits or the portion of the injunction that affect only the Governor. Op. at 5. The Governor did not appeal, and the AG specifically does not represent the Governor,[2] or have standing to challenge an injunction that inflicts an injury solely against the Governor.

The Fourth and Seventh Circuits have held that an appellate court cannot reverse a judgment to the extent it binds a non-appealing party. *Cooper v. Texas Alcoholic Beverage Com'n*, 820 F.3d 730, 739 (5th Cir. 2016) (citing *K.C. ex rel. Africa H. v. Shipman*, 716 F.3d 107, 116 (4th Cir. 2013) (holding that "a 'judgment will not be altered on appeal in favor of a party who did not appeal'—a rule that applies even if 'the interests of the party not appealing are aligned with those of the appellant'"), and (*Cabral v. City of Evansville*, 759 F.3d 639, 643 (7th Cir. 2014) (similar)). Although this Court does not have such a categorical rule, it too permits the alteration of a judgment or order affecting a non-appealing party in only limited circumstances: "when the reversal 'wipes out all basis for recovery against the nonappealing, as well as against the appealing defendant; when the failure to reverse with respect to the nonappealing party will frustrate the execution of the judgment

---

[2]     Following trial, in 2017, counsel for the AG withdrew as counsel for the Governor. ROA.49.

in favor of the successful appellant; or when the appealed decision could reasonably

be read as not being adverse to the nonappealing party.'" (*Cooper*, 820 F.3d at 739

(citing *Anthony v. Petroleum Helicopters, Inc*., 693 F.2d 495, 497-98 (5th Cir.

1982)).

Here, the first exception arguably could have applied—but *only* if the panel

*first* determined that the AG was a proper defendant and, that, therefore, it was

appropriate to reach the merits. *Paterson*, 308 F.3d at 450; *see also Hollingsworth*,

570 U.S. at 708. But if the AG was not a proper defendant because he had no

connection to elections in Terrebonne, as the AG has always contended, then the

panel should either have dismissed the AG's appeal or vacated only those portions

of the judgment affecting the AG. That holding would not have affected the "basis

for recovery against the nonappealing [party]"—the Governor. *Cooper*, 820 F.3d at

739.

### B. The Panel Misapplied Well-Settled Law in Its "Totality of Circumstances" Analysis.

The panel misapplied well-settled Supreme Court and Fifth Circuit precedent

in its review of the totality of circumstances, which a Section 2 case requires.

Specifically, it failed to recognize that as a matter of law: the "Senate Factors" are

non-exhaustive; they are not meant to be comprehensive or exclusive; and there is

no requirement that "any particular number of factors be proved, or that a majority

of them point one way or the other." *Gingles*, 478 U.S. at 45; *see also Westwego*

*Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1120 (5th Cir. 1991) ("No one of the factors is dispositive; the plaintiffs need not prove a majority of them; other factors may be relevant."); *McMillan v. Escambia Cty.*, 748 F.2d 1037, 1042-47 (5th Cir. 1984).

The "two most important factors" are "the existence of [RPV] and the extent to which minorities are elected to public office." *Clark v. Calhoun Cty.*, 88 F.3d 1393, 1397 (5th Cir. 1996) (citing *Gingles*, 478 U.S. at 48 n.15 and *Westwego Citizens for Better Gov't*, 946 F.2d at 1122); *see also Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 499 (5th Cir. 1987) ("[RPV] is the linchpin of a § 2 vote dilution claim."); *McMillan*, 748 F.2d at 1043 ("[RPV] will ordinarily be the keystone of a dilution case"). As to each of these factors, the evidence before the district court was overwhelming.

Section 2's flexible "totality of circumstances" standard allows the Senate Factors to be considered factor by factor, applying only those that are relevant to a particular case. *Veasey v. Abbott*, 830 F.3d 216, 256-65 (5th Cir. 2016) (en banc) (affirming a Section 2 discriminatory results finding based on this Court's analysis of four of the relevant SFs); *Miss. State Chapter, Operation Push v. Allain*, 674 F. Supp. 1245, 1268 (N.D. Miss. 1987), *aff'd*, 932 F.2d 400 (5th Cir. 1991) (affirming a Section 2 discriminatory results ruling after discarding as irrelevant five SFs and finding plaintiffs' evidence satisfied the four remaining SFs relevant to the case);

*McMillan*, 748 F.2d at 1043-47 (affirming a Section 2 discriminatory results violation based on evidence of six of the relevant SFs). Courts in other circuits have found vote dilution based solely on evidence of two of the relevant and key Senate Factors: RPV and the extent to which minority candidates have been elected to office. *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1022 (8th Cir. 2006); *NAACP v. Gadsden Cty. Sch. Bd.*, 691 F.2d 978, 982-83 (11th Cir. 1982).

The panel concluded that Plaintiffs proved only "marginal" vote dilution based on the totality of circumstances. Op. at 18. In so doing, it faulted Plaintiffs for failing to show a single Senate Factor, SF 6 (evidence of "overt or subtle racial appeals" in elections). *Id*. But the lack of evidence of SF 6 is not dispositive in this Circuit—or anywhere else. *See McMillan*, 748 F.2d at 1045 ("The lack of [SFs 4, 6, and 8] . . . does not lead this court to hold for the defendants.").

The majority's opinion commits legal error in failing to recognize the need for the searching review of all of the relevant evidence in assessing the totality of circumstances. *Gingles*, 478 U.S. at 79. The panel did not address the district court's detailed findings after an 8-day trial on all of the Senate Factors—much less did the panel suggest the district court clearly erred in making those findings. While the district court also found that Plaintiffs had not provided direct evidence of SF 6, ROA.29372, the district court recognized that the other evidence presented by

Plaintiffs established a substantial case of vote dilution under the totality of circumstances. ROA.29388.

Beyond Plaintiffs' satisfaction of seven of the nine enumerated Senate Factors, the district court recognized that Judge Ellender was re-elected under the challenged at-large system in 2008 after the Louisiana Supreme Court suspended him for appearing in blackface. ROA.29327. The district court acknowledged Plaintiffs' testimony on this incident as evidence of another factor—SF 5—"past discrimination and current discrimination in other aspects of life, from employment to the political arena" in Terrebonne. ROA.29370 n.298. Remarkably, the panel did not even mention this recent evidence of overt discrimination by a state court judge, and his reelection under the challenged electoral system, in substituting its judgment for the trial court's factual findings about the strength of Plaintiffs' vote dilution case under the totality of circumstances. Its failure to do so highlights its legal errors both in failing to apply the clear error standard of review, and in failing to conduct the "searching practical evaluation of the past and present reality [to determine] whether the political process is equally open to minority voters" as the Supreme Court and Fifth Circuit require. ROA.29319 (quoting *Gingles*, 478 U.S. at 79); *see also June Med. Services L. L. C. v. Russo*, 18-1323, 2020 WL 3492640 at *11 (2020) ("A finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern.")

## CONCLUSION

The petition for rehearing en banc should be granted.


Respectfully submitted,

*/s/ Leah C. Aden*

LEAH C. ADEN
JANAI S. NELSON
SAMUEL SPITAL
NAACP Legal Defense and
 Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
laden@naacpldf.org

MICHAEL DE LEEUW
WILLIAM A. LESSER
Cozen O'Connor
45 Broadway, 16th Floor
New York, NY 10006
(212) 908-1131
mdeleeuw@cozen.com
wlesser@cozen.com

MICHAELE N. TURNAGE YOUNG
NAACP Legal Defense and
 Educational Fund, Inc.
700 14th Street NW, Suite 600
Washington, D.C. 20005
(202) 216-5567
mturnageyoung@naacpldf.org

RONALD L. WILSON
701 Poydras Street, Ste. 4100
New Orleans, LA 70139
(504) 525-4361
cabral2@aol.com

**CERTIFICATE OF COMPLIANCE**

1.      This petition has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, 14 point.

2.      Exclusive of the cover page, certificate of interested persons, table of contents, table of citations, certificate of compliance, and certificate of service, this Petition for Rehearing En Banc contains 3,891 words.

I understand that a material misrepresentation can result in the Court's striking the petition and imposing sanctions. If the Court so directs, I will provide an electronic version of the petition and a copy of the word or line printout.

/s/ *Leah C. Aden*
Leah C. Aden

Attorney for Plaintiffs-Appellees

**CERTIFICATE OF SERVICE**

I certify that on July 13, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system, which will automatically send email notification to all counsel of record.

Dated:　　　July 13, 2020

/s/ *Leah C. Aden*
Leah C. Aden
NAACP Legal Defense and
 Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
T: (212) 965-2200
F: (212) 226-7592
laden@naacpldf.org

*Counsel for Plaintiffs-Appellees,*
*Rev. Vincent Fusilier, Sr., et al.*

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 19-30665

United States Court of Appeals
Fifth Circuit

**FILED**

June 29, 2020

Lyle W. Cayce
Clerk

VINCENT FUSILIER, SR., Reverend; LIONEL MYERS;
WENDELL DESMOND SHELBY, JR.; DANIEL TURNER, JR.;
TERREBONNE PARISH BRANCH NAACP,

      Plaintiffs - Appellees

v.

JEFFREY MARTIN LANDRY, Esq.,
Attorney General for the State of Louisiana, in his official capacity,

      Defendant - Appellant

Appeal from the United States District Court
for the Middle District of Louisiana

Before HIGGINBOTHAM, JONES, and DUNCAN, Circuit Judges.

EDITH H. JONES, Circuit Judge:

African-American voters and the Terrebonne Parish NAACP filed suit in 2014 to challenge the electoral method for Louisiana's 32nd Judicial District Court ("32nd JDC"). They asserted that at-large elections for the judges produce discriminatory results, violating Section 2 of the Voting Rights Act, and have been maintained for a discriminatory purpose in violation of that statute and the Fourteenth and Fifteenth Amendments. After trial, the district court upheld both claims. Eventually, it ordered a remedial plan breaking the 32nd JDC into five single-member electoral subdistricts. Louisiana's Attorney General appealed.

No. 19-30665

Careful review persuades us that the district court erred legally and factually. Specifically, the court erred in holding that weak evidence of vote dilution could overcome the state's substantial interest in linking judicial positions to the judges' parish-wide jurisdiction, and it erroneously equated failed legislative attempts to create subdistricts for the 32nd JDC with a racially discriminatory intent. We REVERSE.[1]

## BACKGROUND

The 32nd JDC encompasses Terrebonne Parish. Terrebonne Parish begins south of New Orleans and covers territory extending well into the bayous and ultimately to the Gulf of Mexico. Formerly the site of sugar plantations, the parish became a hub for the offshore oil and gas industry seventy years ago. The Parish seat is located in Houma, population over 30,000, with a few smaller towns and Cajun residents still living among the bayous. Of the parish's population, about ten percent of the residents still spoke French at home according to the 2010 Census; slightly less than 19% of the residents were black.

Since its creation in 1968, elections for the five judicial seats in the 32nd JDC have been conducted on an at-large basis. The plaintiffs' lawsuit took issue with this electoral method, asserting claims under Section 2 of the Voting Rights Act ("VRA") and unconstitutional racial discrimination. They initially named as defendants then-Louisiana Governor Piyush "Bobby" Jindal, Attorney General James "Buddy" Caldwell, and Secretary of State Tom Schedler. During discovery, the plaintiffs, without explanation, moved to dismiss the Secretary of State with prejudice. The district court granted that motion.

---

[1] The issuance of this opinion renders moot the state's motion to stay the district court's final judgment and injunction pending appeal.

No. 19-30665

After an eight-day bench trial, the district court held in 2017 that Louisiana's use of an at-large voting system for the 32nd JDC "deprives black voters of the equal opportunity to elect candidates of their choice in violation of Section 2" of the VRA, and that the voting system "ha[d] been maintained for that [discriminatory] purpose, in violation of Section 2 and the United States Constitution." The court reached these conclusions after rejecting the defendants' standing argument and their claim of Eleventh Amendment immunity.

The district court invited the parties to submit proposals "regarding the appropriate remedy for the court and legislature to take." Neither the defendants nor the Louisiana legislature, for two legislative sessions, offered a plan conforming to the judgment. A new judge was substituted after the trial judge passed away, and in early 2019 the court determined that it "would be aided by the technical expertise of a Special Master" in reviewing the plaintiffs' proposed districting plans. The Special Master endorsed, and the district court adopted, a plan to divide the 32nd JDC into five single-member subdistricts, one of which was created as a likely majority-black district. The district court then enjoined the Governor and Attorney General "from administering, implementing, or conducting any future elections for the 32nd JDC in which [judges] are elected on an at-large basis;" commanded them to "ensure that all elections for the 32nd JDC . . . be conducted using the remedial redistricting [p]lan;" and ordered them to "take all steps necessary to implement the five single-member district plan . . . in order to allow district-based elections to proceed." Only the Attorney General has appealed from this adverse judgment.

## STANDARD OF REVIEW

This court reviews questions of subject matter jurisdiction, including standing, *de novo*. *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655,

3

659 (5th Cir. 2006). We likewise review *de novo* "the legal standards the district court applied to determine whether Section 2 has been violated," but "we review the district court's findings on the *Gingles* threshold requirements and its ultimate findings on vote dilution for clear error." *Sensley v. Albritton,* 385 F.3d 591, 595 (5th Cir. 2004). A factfinding of intentional discrimination in a voting rights case is also reviewed for clear error. *United States v. Brown*, 561 F.3d 420, 432 (5th Cir. 2009). "The clear error standard precludes reversal of a district court's findings unless we are 'left with the definite and firm conviction that a mistake has been committed.'" *Rodriguez v. Bexar County*, 385 F.3d 853, 860 (5th Cir. 2004) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S. Ct. 1504, 1511 (1985)).

## DISCUSSION

The Attorney General challenges the plaintiffs' standing to assert their claims and raises an Eleventh Amendment sovereign immunity defense. He contends that the plaintiffs' vote dilution claim fails the preconditions established in *Thornburg v. Gingles*, 478 U.S. 30, 106 S. Ct. 2752 (1986). In particular, he asserts that the court discounted this court's en banc decision in *League of United Latin Am. Citizens, Council No. 4434 v. Clements,* 999 F.2d 831, 868 (5th Cir. 1993) ("*LULAC*"), which holds, as a matter of law, that a state's "substantial" "linkage interest" in at-large judicial elections "may be overcome only by evidence that amounts to substantial proof of racial dilution. Otherwise, the at-large election of district court judges does not violate Section 2." Finally, he argues that the district court erred in finding intentional discrimination. We are persuaded by the last two of these contentions and reverse on that basis.

## I

Taking a novel position in voting rights litigation, the Attorney General argues that the plaintiffs lack Article III standing to sue after they dismissed

No. 19-30665

the Secretary of State and, alternatively, the Eleventh Amendment bars this suit. Neither argument works. In order to have constitutional standing, a plaintiff must establish (1) an injury in fact that is (2) fairly traceable to the challenged action of the defendant and (3) redressable by a favorable ruling. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 2136 (1992). Although the Governor has not appealed, the district court must have had jurisdiction to find liability and fashion a remedial order against the Governor. Further, standing must exist at all stages of the litigation. *Fontenot v. McCraw*, 777 F.3d 741, 747 (5th Cir. 2015). The plaintiffs plainly had standing to maintain suit against Louisiana's Governor. Without raising any complaint in the past about his standing, the Governor has been a party defendant in nearly all of Louisiana's voting rights cases challenging judicial districts[2], and as chief executive, he plays a pivotal role in the enactment of legislation that could address any adverse federal judgment. *Cf. Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 159 (5th Cir. 2007) ("A case brought against a state officer in his official capacity is essentially a suit against the state. . . . Because the state itself is a party, causation and redressability are easily satisfied in this case. . . . A declaration of unconstitutionality directed against the state would redress [the plaintiff's] injury . . . .").[3] In contrast, the Secretary of State, although an elected official[4], is responsible for conducting elections only after the districts have been changed, whether by law or by court order. The

_____

[2] *See, e.g.*, *Chisom v. Roemer*, 501 U.S. 380, 384, 111 S. Ct. 2354, 2358 (1991); *Prejean v. Foster*, 83 Fed. App'x 5 (5th Cir. 2003); *Hall v. Louisiana*, 983 F. Supp. 2d 820, 824 (M.D. La. 2013).

[3] The plaintiffs sought, among other remedies, a declaration that the challenged electoral scheme was unconstitutional. Such a declaration would be sufficient to redress the plaintiffs' injuries insofar as it would force the state—who the Governor, in his official capacity, represents—to prescribe another plan before proceeding with elections.

[4] In Texas, by contrast, the Secretary of State holds a gubernatorial appointment.

5

Attorney General's implicit argument that only the Secretary of State should have been sued is wrong.[5]

The Attorney General's other jurisdictional argument is that the Eleventh Amendment shields him and the Governor from suit. The parties spar over the prerequisites of *Ex parte Young*'s exception to Eleventh Amendment immunity. *See Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441 (1908); *Okpalobi v. Foster*, 244 F.3d 405, 414–15 (5th Cir. 2001) (en banc). Both parties miss the mark. "The VRA, which Congress passed pursuant to its Fifteenth Amendment enforcement power, validly abrogated state sovereign immunity." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017). Thus, the immunity from suit these officials might otherwise enjoy offers no protection from VRA suits, whether premised on dilution or intentional discrimination.

## II

Addressing the merits of the appeal, the Attorney General initially challenges the district court's finding of vote dilution, followed by its finding of intentional racial discrimination in the legislature's failure to voluntarily adopt single-member districts for judicial elections in the 32nd JDC.

## A

Section 2 of the VRA prohibits states from imposing or applying any "standard, practice, or procedure . . . which results in a denial or abridgement

---

[5] This conclusion is a unique product of the VRA, enacted under the Fifteenth Amendment to protect the voting rights of African-Americans from state interference. *See United States v. Mississippi,* 380 U.S. 128, 136–38, 85 S. Ct. 808, 812–13 (1965) (state can be directly sued pursuant to VRA implementing the Fifteenth Amendment). This decision, accordingly, does not authorize parties to sue the Governor (or other state officer) whenever a party challenges duly enacted laws. *See, e.g., Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) (en banc). Further, we take no position on whether, had the court's remedial order here been upheld, standing would exist and the court could have enforced its remedy without the continued presence of the Secretary of State, who is Louisiana's chief elections officer.

No. 19-30665

of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).  A violation of Section 2

> is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [racial] class of citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* § 10301(b).

Section 2 claims brought against multimember electoral districts are governed by the framework established in *Thornburg v. Gingles*.  "Under *Gingles*, plaintiffs challenging an at-large system on behalf of a protected class of citizens must demonstrate that (1) the group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) it is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." *LULAC*, 999 F.2d at 849.  Satisfaction of these three "preconditions" is necessary, but not sufficient, to establish liability.  *Id.*  "Plaintiffs must also show that, under the 'totality of circumstances,' they do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters." *Id.*  The so-called "*Zimmer* factors" guide this second inquiry. *Id.*[6]

---

[6] These factors include:
   1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
   2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
   3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting

No. 19-30665

The Attorney General maintains that the plaintiffs' claim of vote dilution fails each of the *Gingles* preconditions as well as the ultimate totality of circumstances standard. A searching and practical review of the electoral conditions in Terrebonne Parish is required to evaluate the district court's determinations. *Gingles,* 478 U.S. at 45, 106 S. Ct. at 2764.

**1**

The Attorney General avers that the plaintiffs' claim fails the first *Gingles* precondition because the parish's African-American community is neither sufficiently large nor geographically compact to make up a single member district that complies with traditional districting principles. To support this argument, he postulates that the 50.4% of non-Hispanic black voting age population in the plaintiffs' proposed majority-minority district, District 1, falls short of the bare majority needed to satisfy *Gingles*'s numerosity requirement.[7] *See Bartlett v. Strickland*, 556 U.S. 1, 18, 129 S. Ct.

---

practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction;

8. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

9. whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.
*See LULAC*, 999 F.2d at 849 n.22; S. Rep. No. 97-417, at 28–29 (1982).

[7] Some of the Attorney General's complaints are mistakenly lodged against the Special Master's remedial plan. At *Gingles* step one, our evaluation is limited to whether the plaintiffs offered sufficient evidence of numerosity and compactness. To do this, we consider the plaintiffs' proposed districting map ruled on by the trial court, not the remedial plan eventually accepted.

No. 19-30665

1231, 1245 (2009) ("[T]he majority-minority rule relies on an objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?"). He also points to the odd shape of the plaintiffs' proposed remedial map, arguing that it undermines the court's finding of compactness and is at odds with traditional districting principles.

Turning first to the Attorney General's numerosity argument, the district court noted that both plaintiffs' and defendants' experts "agreed that the black population in Terrebonne is sufficiently numerous such that [proposed] District 1 has a greater than 50% voting-age black population." The Attorney General's current position is thus inconsistent with the view expressed by his own expert. Perhaps recognizing as much, the Attorney General argues that the percentages cited by the district court fail to account for voter turnout. Because black voter turnout is substantially lower than white voter turnout, the Attorney General argues there is no reasonable opportunity for the threadbare majority of black voters in District 1 to elect a candidate of their choice. The first *Gingles* precondition, however, does not require a showing that a majority of the voters in a future election will be black. All the plaintiffs have to show is that the black minority is numerous enough to "constitute a majority in a single-member district." *LULAC*, 999 F.2d at 849. That is not to say that the probability of blacks electing their preferred candidates in future elections is irrelevant. To the contrary, this bears on the totality of the circumstances, which we discuss later. *See Abbott v. Perez*, 138 S. Ct. 2305, 2332 (2018) ("Under *Gingles*, the ultimate question is whether a districting decision dilutes the votes of minority voters, . . . and it is hard to see how this standard could be met if the alternative to the districting decision at issue would not enhance the ability of minority voters to elect the candidates of their choice."); *Harding v. County of Dallas*, 948 F.3d 302, 310–11 (5th Cir.

No. 19-30665

2020). The Attorney General's argument is misplaced at this stage of the analysis.

Even so, the trial record casts doubt not only on the effectiveness of the proposed voting age majority, but also on the compactness of the proposed district. The plaintiffs' plan constructed a horseshoe shape district around Houma in order to pick up minority residential areas in that town and in Gray and Schriever.[8] The plaintiffs' plan split fourteen of the twenty-one voting precincts affected by the proposed majority-minority district. *Cf. Bush v. Vera*, 517 U.S. 952, 974, 116 S. Ct. 1941, 1959 (1996) (criticizing redistricting plan for splitting "local election precincts"). The majority-minority district also suffered from very low compactness scores on both mathematical matrices cited by the parties. And its odd shape suggests that race served as the *sine qua non* for selecting which blocks to include in the proposed district, all in an effort to achieve the necessary demographic of 50% plus one black voting age population. *See Sensley v. Albritton*, 385 F.3d 591, 596 (5th Cir. 2004) ("As the geographical shape of any proposed district necessarily directly relates to the geographical compactness and population dispersal of the minority community in question, it is clear that shape is a significant factor that courts can and must consider in a *Gingles* compactness inquiry.").

Appellees respond that neither the district's contorted horseshoe shape nor its compactness scores count against a finding of vote dilution because other political districts in this area, *e.g.* for the state legislature and the parish council and school board, "resemble" its shape. *See Houston v. Lafayette County*, 56 F.3d 606, 611 (5th Cir. 1995). Nonetheless, this comparison with

---

[8] Compactness may often be in the eye of the judicial beholder, but plaintiffs' proposed district is not far off from those condemned by the courts in *Bush v. Vera*, 517 U.S. 952, 116 S. Ct. 1941 (1996); *Shaw v. Reno*, 509 U.S. 630, 113 S. Ct. 2816 (1993); and *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S. Ct. 125 (1960).

No. 19-30665

other misshapen districts does not make a strong case for the first *Gingles* factor.

Moreover, given several facts noted by the district court, satisfying this factor was inherently challenging for plaintiffs.  African-Americans comprised barely 19% of the 112,000 residents of Terrebonne Parish according to the 2010 Census (or 20% if counted by Any-Part Black).  Nearly all of their numbers had to be joined to give them an "opportunity district" within a five-member judicial body.  Additionally, the locations of small towns, interconnecting roads, and many bayous formed natural barriers to traditional districting.  But we owe deference to the district court on this highly factual issue and are unable to conclude that the court clearly erred.  In addition to analyzing compactness scores and the number of split precincts, the court observed that the plaintiffs' remedial plan maintained communities of interest, contained contiguous districts, protected incumbents, and respected the principle of one person, one vote.  In sum, while the district court's compactness analysis is far from ironclad, it is not so erroneous as to alone warrant reversal.

**2**

The second and third *Gingles* preconditions pose the same question, but for different demographic groups:  Is there significant racial bloc voting (or racially polarized voting)?  *See Gingles*, 478 U.S. at 56, 106 S. Ct. at 2769; *Teague v. Attala County*, 92 F.3d 283, 287–88 (5th Cir. 1996).  The district court answered these questions in the affirmative, as it found that "a significant number of minority group members usually vote for the same candidates" and whites typically vote in such a way that they "normally will defeat the combined strength of minority support plus white 'crossover' votes." *Gingles*, 478 U.S. at 56, 106 S. Ct. at 2769.

The Attorney General has nothing to say about the proven political cohesiveness of the parish's black voters.  Instead, he contends that the

11

No. 19-30665

unopposed 2014 election of African-American Juan Pickett to the 32nd JDC constituted powerful evidence that white Terrebonne parish voters do not typically vote in such a way as to defeat the minority's supported candidate. The relevant standard for evaluating this signal victory is whether "the white majority votes sufficiently as a bloc to enable it—*in the absence of special circumstances, such as the minority candidate running unopposed . . .*—usually to defeat the minority's preferred candidate." *Id.* at 51 (emphasis added); *see also Rollins v. Fort Bend Indep. Sch. Dist.*, 89 F.3d 1205, 1213 (5th Cir. 1996) (permitting consideration of special circumstances to "explain a *single minority candidate's victory*" (emphasis added)). The district court makes much of the facts that Juan Pickett ran unopposed and his election occurred during the pendency of this litigation. The former consideration suggests Pickett's election was a fluke, while the latter consideration has been held relevant to the "special circumstances" assessment. *Clark v. Calhoun County*, 21 F.3d 92, 96 (5th Cir. 1994). Yet the district court, and the plaintiffs for that matter, go on to imply that Judge Pickett "was not clearly the Black community's candidate of choice." That the judge had been a member of the local community for many years, that he had served as an Assistant District Attorney for seventeen years and been the Terrebonne Parish bar president, and that he had been seeking political support long before 2014, are unmentioned in the district court's findings. Judge Pickett's admirable record would seem to have been a noteworthy "special circumstance" suggesting why he cleared the field of opponents before the election.

Significant as Judge Pickett's election should be, contrasting with this single election is testimony from the plaintiffs' expert, Dr. Engstrom, that "the magnitude of polarization" in this case was significant. Dr. Engstrom analyzed seven elections, spanning over twenty years, in which at least one black candidate competed against one white candidate. The candidates preferred by

12

No. 19-30665

black voters lost every time, and in each case, he found a high degree of racially polarized voting.

Because most of the election results Dr. Engstrom analyzed were exogenous and decades-old, the Attorney General contends that they are not probative of contemporary voting patterns for the 32nd JDC. This argument has some force, but it is insufficient to establish clear error for two reasons. First, Dr. Engstrom was forced to analyze exogenous election results because all recent elections for the 32nd JDC have been uncontested. Reliance on exogenous election results in this circumstance has received this court's sanction. *See Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1202, 1209 (5th Cir. 1989) (approving reliance on exogenous election results where no statistics were available for endogenous elections involving a minority candidate). That being said, the lack of contested judicial elections can also be explained by the dearth of minority candidates qualified to run for the 32nd JDC. (We consider this fact among the totality of the circumstances.) Second, the defendants' expert, Dr. Weber, also found racially polarized voting in five of the seven elections Dr. Engstrom analyzed. Dr. Weber criticized reliance on stale, exogenous elections and discounted election results for non-parish-wide positions. Such concerns are far from trivial, particularly in light of Judge Pickett's success, but they do not withstand the deferential standard of review.

**3**

Even if all three *Gingles* preconditions are sustainable, Section 2 is not violated unless the totality the circumstances also "weigh[s] in favor of a finding that at-large voting for the 32nd JDC interacts with social and historical factors to cause an inequality in the political process for black voters." At this level, contrasted with the relatively weak support for the

No. 19-30665

plaintiffs' position on the *Gingles* factors, the Attorney General's arguments become decisive.

The district court found that seven of the nine *Zimmer* factors weighed in the plaintiffs' favor. The Attorney General homes in on one of those factors—the State's policy justification for selecting trial court judges in at-large elections.[9] Louisiana asserts a linkage interest in the use of at-large judicial elections, that is, an "interest in maintaining the link between a district judge's jurisdiction and the area of residency of his or her voters." *Houston Lawyers' Ass'n v. Attorney Gen. of Tex.*, 501 U.S. 419, 426, 111 S. Ct. 2376, 2381 (1991). Following *Houston Lawyers' Association,* this court examined the substantiality of this interest at length in the en banc *LULAC* case. As Judge Higginbotham explained there, "by making coterminous the electoral and jurisdictional bases of trial courts," the State "advances the effectiveness of its courts by balancing the virtues of accountability with the need for independence. . . . A broad base diminishes the semblance of bias and favoritism towards the parochial interests of a narrow constituency." *LULAC*, 999 F.2d at 869. In contrast, subdistricting introduces the appearance of ward politics, detracting from the appearance of judicial independence. *Id.* Moreover, the "inescapable truth" is that destroying linkage diminishes minority influence. *Id.* at 873. By creating a majority-minority district, many minority voters are "marginalized, having virtually no impact on most district court elections." *Id.*

_____

[9] The Attorney General also correctly notes that among the *Zimmer* factors is the state's "history" of official electoral discrimination. Two points are relevant. First, as the Chief Justice has observed, "our country has changed" in its treatment of minorities. *Shelby County v. Holder,* 570 U.S. 529, 557, 133 S. Ct. 2612, 2631 (2013). Second, that the state failed to receive preclearance from DOJ under the now-void Section 4 of the VRA does not prove this "historical" point, because the Section 4 test did not deal with actual discrimination in election practices but with the lesser charge of "backsliding." *Reno v. Bossier Parish School Bd.*, 528 U.S. 320, 335, 120 S. Ct. 866, 875 (2000).

No. 19-30665

The district court in this case acknowledged the state's potential linkage interest, but it declared the interest insubstantial for five reasons. "First, the Louisiana Constitution does not require that trial court judges be elected at-large." "Second, in the late 1980s Louisiana 'stifled its policy arguments' regarding linkage by agreeing to create judicial subdistricts to end the *Clark* litigation." "Third, outside of litigation, Louisiana has continued to show that it no longer has a linkage interest as it has created subdistricts for trial courts." "Fourth, subdistricts are now common in Louisiana, and a majority of the [judicial district court ('JDC')] judges in Louisiana are elected by subdistrict." And fifth, "Louisiana has recognized that subdistricts are an important way of providing black voters an equal opportunity to elect their preferred candidates to trial courts." Each of these stated reasons, however, is either legally infirm or factually wrong.

Before explaining why, we emphasize that the substantiality of Louisiana's linkage interest is a legal question, not a factual one. *LULAC*, 999 F.2d at 871. The district court's holding consequently receives no deference. In addition, a state's linkage interest, while not controlling in a vote dilution case, lies at the heart of representative government and thus must be treated with great respect. The people of Louisiana have a significant interest in defining the structure and qualifications of their judiciary. *See Gregory v. Ashcroft*, 501 U.S. 452, 463, 111 S. Ct. 2395, 2402 (1991). This interest could be gainsaid by evidence establishing that the State abandoned any interest in linkage. But such evidence would itself have to be substantial since our scrutiny is less "demanding where we deal with matters resting firmly within a State's constitutional prerogatives," including "the establishment and operation of . . . government, as well as the qualifications of an appropriately designated class of public office holders." *Sugarman v. Dougall*, 413 U.S. 634, 648, 93 S. Ct. 2842, 2850, 2851 (1973). These principles frame the analysis of

the district court's tendered reasons for dismissing Louisiana's linkage interest.

First, that Louisiana's Constitution does not require the election of district court judges on an at-large basis is of no import. This court considered a similar argument in *LULAC*. There, the plaintiffs argued that "Texas abandoned its linkage interest by allowing the residents of counties to 'opt out' of the linkage structure by selecting judges from regions smaller than a county." *LULAC*, 999 F.2d at 875. This court concluded that such an option was irrelevant since the people of Texas had, despite the option, chosen to elect judges at the county level. *Id.* Similarly, the fact that Louisiana's Constitution perhaps permits different election schemes is immaterial unless Louisiana has actually adopted such schemes.[10]

Louisiana's purported adoption of subdistricting for some judicial elections leads to the second, third, and fourth reasons cited by the district court for questioning the state's linkage interest. The district court stated that Louisiana's decision to settle the *Clark* litigation in the 1980s, by creating some judicial subdistricts for parishes covered by that litigation, evidences an abandonment of its current policy arguments. Not so. Importantly, the *Clark* settlement predated *LULAC*, in which this court first confirmed the significance of a state's linkage interest. More to the point, the settlement was unrelated to the 32nd JDC—or any other district not specifically mentioned in

---

[10] Additionally—and contrary to the district court's conclusion—this court has read Louisiana's Constitution to support the State's asserted linkage interest. *See Prejean v. Foster*, 227 F.3d 504, 517 & n.23 (5th Cir. 2000).

Further, in Rule 28(j) letters, the parties have debated the significance of the 2020 legislature's approval of certain judicial subdistricts, "including a redistricting plan that contains a Black voter opportunity sub-district, for the 14th JDC," as evidence that the state no longer maintains its linkage interests. But no *new* sub-districts were created; the legislature simply redistricted those already in existence, and the preexisting 14th JDC sub-districts were the result of the *Clark* litigation.

No. 19-30665

the consent decree.[11]  It represented nothing more than the resolution of a long-running and costly legal dispute over a few judicial district courts and in no way represented an abandonment of Louisiana's more general interest in conducting at-large judicial elections.[12]

The district court next found that Louisiana "continue[s] to show that it no longer has a linkage interest as it has created subdistricts for trial courts." The district court provided no further analysis on this point,[13] but it seems related to the court's fourth basis for labeling the State's interest as insubstantial: "subdistricts are now common in Louisiana, and a majority of the JDC judges in Louisiana are elected by subdistrict."  This finding, charitably, was the product of statistical gymnastics.  First, the district court excluded Orleans Parish from its count, despite that parish both electing judges parish-wide and having a large number of judges.  Next, the court measured the number of judges elected by subdistricts rather than considering that the majority of JDCs still use at-large elections.  And even then, only by excluding Orleans Parish was the district court able to conclude that a majority of judges are elected from subdistricts.  With the Orleans Parish judges included, the number of judges elected from subdistricts falls to fewer than half.  The district court also failed to account for the reality that all but one of

---

[11] In fact, the plaintiffs excluded the 32nd JDC from the *Clark* litigation because the minority population in Terrebonne Parish was too small to accommodate a "minority opportunity" subdistrict there.

[12] In *LULAC,* this court noted that Louisiana "abandoned the link between jurisdiction and electoral base" for judicial elections "to settle prolonged litigation." *LULAC,* 999 F.2d at 872, n.33; and in *Prejean,* the court noted "the state stifled its policy arguments to obtain final preclearance." *Prejean,* 227 F.3d at 510–12. These statements are *descriptive,* however, not *prescriptive,* as the district court seemed to suggest.

[13] The court may have been referring to the voluntary creation of majority-minority subdistricts for city and juvenile courts.  These courts, however, are distinct from district courts, which operate at the parish level.

the subdistricted JDCs are a result of the *Clark* litigation and ensuing consent decree. Once these considerations are taken into account, it is clear that Louisiana maintains an interest in conducting at-large elections for district court judgeships.

Finally, the district court relied on the findings of a 1996 task force created by the Louisiana Supreme Court, which found that the creation of "subdistricts, where appropriate, [is] the only feasible means of ensuring diversity and ethnic heterogeneity in our judicial system." The task force, however, never represented the will of the state, nor was it authorized to bind the state to its positions. Its findings, moreover, are over two decades old.

In short, the district court's stated reasons for rejecting Louisiana's linkage interest are less than compelling. Our review of the record confirms that Louisiana has a substantial interest in retaining at-large elections. To be sure, this conclusion does not put an end to the plaintiffs' claim of vote dilution. *See Houston Lawyers' Ass'n*, 501 U.S. at 426, 111 S. Ct. at 2381. Louisiana's substantial linkage interest must be balanced against the evidence of vote dilution. *Id.* At this stage, the plaintiffs bear the burden of offering substantial proof of dilution to overcome the state's interest in linkage. *LULAC*, 999 F.2d at 876.

The plaintiffs fail to carry that burden. At best, they have demonstrated a marginal case of vote dilution. The plaintiffs have presented no evidence of overt or subtle racial appeals in elections for the 32nd JDC. Furthermore, much of the evidence reflecting polarized voting derives from exogenous, decades-old elections. Most elections for the 32nd JDC have been uncontested. This is likely due to the fact that only a few members of the minority class are eligible to be elected to the 32nd JDC. Although this court has not precluded vote dilution claims where few minority candidates have *run* for office, *see Clark v. Calhoun County*, 88 F.3d 1393, 1398 (5th Cir. 1996), the number of

No. 19-30665

minority candidates *eligible* for office certainly is relevant, *LULAC*, 999 F.2d at 865. Indeed, "we are instructed to evaluate the totality of the circumstances with a 'functional view of the political process.'" *Id.* (quoting *Gingles*, 478 U.S. at 45, 106 S. Ct. at 2764). And a "functional analysis of the electoral system must recognize the impact of limited pools of eligible candidates on the number of minority judges that has resulted." *Id.* Unlike many public offices, judgeships are foreclosed to most of the population, not because the majority defines who is qualified at the ballot box, but because those qualifications are set by law. The Louisiana Constitution sets the qualifications for district court judges, requiring domicile in the district for one year and admittance to the state bar for at least eight years. LA. CONST. art. V, § 24. In Terrebonne Parish, just a handful of minority citizens—about ten, according to the district court—meet these qualifications (to say nothing of the number of qualified minority lawyers in the plaintiffs' proposed remedial district).

We also must consider voter turnout, an issue mentioned previously in passing. As this court recently explained, plaintiffs need not demonstrate guaranteed success under a hypothetical redistricting plan to prevail on a claim of vote dilution. *Harding*, 948 F.3d at 309. Yet, at the same time, "an alternative map containing an additional majority-minority district does not necessarily establish an increased opportunity." *Id.* And as *Perez* and *Harding* remind, plaintiffs must meet the overarching demand that their new districting scheme enhances their ability to elect candidates of their choosing. *Perez*, 138 S. Ct. at 2332. The plaintiffs' experts acknowledged that black voter turnout in Terrebonne Parish lags behind white voter turnout. Relatedly, the defendants' expert attested that a 56% black voting age population was required to ensure blacks have the opportunity to elect their preferred candidates. At best, the plaintiffs' proposed remedial district had a black voting age population of 53.33%. That the plaintiffs' proposed majority-

No. 19-30665

minority district sufficiently enhances minority voters' ability to elect the candidates of their choice is not a well-supported proposition on this record.

Coupling these problems with the compactness concerns discussed above and the district court's mischaracterization of Louisiana's linkage interest, we are left with the firm conviction that the district court erred in finding a violation of the VRA.

## B

The district court's finding of discriminatory intent formed an independent basis for liability. *McMillan v. Escambia County*, 748 F.2d 1037, 1046 (Former 5th Cir. 1984). An election practice violates Section 2 and the Fourteenth and Fifteenth Amendments if it is undertaken and maintained for a discriminatory purpose. *United States v. Brown*, 561 F.3d 420, 432 (5th Cir. 2009). Under this intent-based approach, "[r]acial discrimination need only be one purpose, and not even a primary purpose, of an official act" for a violation to occur. *See Velasquez v. City of Abilene,* 725 F.2d 1017, 1022 (5th Cir. 1984). But discriminatory intent "implies more than intent as volition or intent as awareness of consequences. . . . It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S. Ct. 2282, 2297 (1979). "To find discriminatory intent, 'direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions' may be considered." *Brown*, 561 F.3d at 433 (quoting *McMillan,* 748 F.2d at 1037).

Five non-exhaustive factors guide courts in determining whether a particular decision was made with a discriminatory intent:   (1) the discriminatory impact of the official action; (2) the historical background of the decision; (3) the specific sequence of events leading up to the challenged action;

No. 19-30665

(4) substantive and procedural departures from the normal-decision making process; and (5) contemporaneous viewpoints expressed by the decision-makers. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68, 97 S. Ct. 555, 564–65 (1977); *see also Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir. 2016) (en banc).

Applying these factors, the district court found that a discriminatory purpose motivated maintenance of the at-large election system for the 32nd JDC. This conclusion was based primarily on the discriminatory impact of at-large voting, the sequence of events leading to the rejection of efforts to create a majority-minority subdistrict, and the supposedly pretextual arguments made by the opponents of subdistricting.[14] We have already determined that, by inadequately substantiating plaintiffs' vote dilution claim, the district court erred in its assessment of discriminatory impact. The district court's decision thus stands on two findings.

Black residents in Terrebonne Parish began advocating judicial subdistricting in the 1980s. Over the years, multiple bills proposing the creation of a majority-minority subdistrict were introduced in the Louisiana legislature, but none passed both houses. The district court was convinced that

---

[14] The district court also suggested that its holding was based on Louisiana's well-documented history of *de jure* discrimination. But *Arlington Heights* calls for an examination of the historical background of the *challenged* decision, not a probing investigation into an alleged pattern of statewide discrimination. *See Vill. of Arlington Heights*, 429 U.S. at 267, 97 S. Ct. at 564. The plaintiffs recognize as much and suggest that the adoption of an at-large election method for the 32nd JDC was prompted by a desire to dilute the strength of the black vote. Louisiana district court judges, however, have long been elected on an at-large basis—before creation of the 32nd JDC and before passage of the VRA. *Clark v. Roemer*, 751 F. Supp. 586, 588 (M.D. La. 1990), *rev'd*, 500 U.S. 646, 111 S. Ct. 2096 (1991). Louisiana's linkage interest explains this choice. Were we to conclude otherwise—with no direct evidence that racial prejudice spurred the adoption of at-large elections for Louisiana's JDCs—every at-large election scheme for judicial districts would be subject to judicial scrutiny as being formed and maintained for a discriminatory purpose. In other words, the State's long-standing linkage interest would be subordinated to a pretext for discrimination.

No. 19-30665

the failure of this legislation was driven, in part, by racial discrimination. The evidence, taken in context, does not support the district court's findings.

Fundamental to this inquiry is the sensitive nature of questioning the intent of lawmakers. *See Vill. of Arlington Heights*, 429 U.S. at 266, 97 S. Ct. at 564. "Proving the motivation behind official action" has been described as "a problematic undertaking," *Hunter v. Underwood*, 471 U.S. 222, 228, 105 S. Ct. 1916, 1920 (1985), and "a hazardous matter," *United States v. O'Brien*, 391 U.S. 367, 383, 88 S. Ct. 1673, 1682 (1968). Accordingly, direct evidence of discriminatory intent must be prioritized over circumstantial evidence (though such evidence remains relevant). *See Feeney*, 442 U.S. at 279, 99 S. Ct. at 2296; *see also Veasey v. Abbott*, 796 F.3d 487, 503 n.16 (5th Cir. 2015), *reh'g en banc granted*, 830 F.3d 216 (5th Cir. 2016) ("While it is true that it is unlikely for a legislator to stand in the well of the state house or senate and articulate a racial motive, it is also unlikely that such a motive would permeate a legislative body and not yield any private memos or emails."). Similarly, state legislatures are afforded a presumption of good faith. *Perez*, 138 S. Ct. at 2324. Legislative decisions are, of course, not immune from review. But the Supreme Court has long cautioned against the quick attribution of improper motives, which would interfere with the legislature's rightful independence and ability to function. *See Flemming v. Nestor*, 363 U.S. 603, 617, 80 S. Ct. 1367, 1376 (1960) ("[O]nly the clearest proof could suffice to establish the unconstitutionality of a statute on [the] ground [of improper legislative motive].").

The district court relied exclusively on circumstantial evidence surrounding the Louisiana legislature's rejection of several proposals to create a new judgeship for the 32nd JDC. The first piece of legislation proposing the creation of an additional judgeship was introduced in 1997. As originally conceived, the judgeship would be elected at-large. Minority residents of

No. 19-30665

Terrebonne Parish proposed an alternative: the creation of a majority-minority subdistrict. Legislative staff responded that the proposed minority subdistrict would not be contiguous and would violate reapportionment jurisprudence. Upon the request of subdistricting proponents, the legislative staff drafted contiguous subdistrict boundaries but found that they exposed the district to attack as racially gerrymandered. Because it was not possible to draw a majority-minority district that complied with law, the bill was tabled.

The district court viewed this action as pretext for racial discrimination because the U.S. Department of Justice had never objected to a majority-black subdistrict although it had objected to the creation of additional at-large judgeships. However, applying the presumption of good faith, it seems perfectly reasonable for legislators to be concerned about traditional districting principles and the prejudicial effects of racial gerrymandering. This is especially so given that the parties to the *Clark* litigation agreed that creating a majority-minority subdistrict for the 32nd JDC was not feasible because of Terrebonne Parish's demographics. The choice to evade claims of racial gerrymandering by tabling a controversial piece of legislation does not reveal discriminatory intent. If anything, these events suggest that the state legislature was cognizant of federal preclearance practices as well as the concerns of the subdistricting proponents.

The next bill to propose the creation of a sixth at-large judgeship was introduced in 1998. It passed the Senate but did not come up for a vote in the House. The district court made much of the bill's success in the Senate despite opposition from black residents. But legislation succeeds or fails standing alone. It is no evidence of discriminatory intent. Furthermore, the fact that a proposal to create a sixth at-large judgeship failed—that is to say, the same election method criticized as producing discriminatory results—blunts the

No. 19-30665

plaintiffs' argument that racial discrimination infected the legislature's decision making.

The district court next points to a request from Judge Ellender, a judge on the 32nd JDC acting on behalf of the court, asking the Judicial Council in mid-1998 to recommend an additional judgeship. The judges of the court revoked that request a few months later because juvenile matters, a significant portion of their caseload, had been transferred to the Houma City Court. The district court questioned the authenticity of this about-face and appeared incredulous that the judges would ever rescind a judgeship request. It found that, at the time the request was initially sent, the 32nd JDC judges were likely aware of advocacy from black residents calling for subdistricting. That may be true (though the district court cites little evidence to prove this). But it in no way evinces racial prejudice. The asserted basis for withdrawing the request for an additional judgeship was a reduced workload. The Judicial Council confirmed the 32nd JDC judges' acknowledgement of a smaller docket, concluding in a supplemental report that an additional judgeship was not warranted since Houma City Court was handling juvenile matters. The plaintiffs provide no evidence to support the assertion that the Judicial Council's otherwise laudable effort to conserve taxpayer resources was a coverup for racial prejudice.

The fourth piece of legislation scrutinized by the district court was proposed in 1999 and called for the creation of a sixth judge to be elected from a majority-minority subdistrict. Judge Ellender wrote to the chair of the Senate Judiciary Committee, recommending that the chairman vote against the bill because the judges had withdrawn the request for an additional judgeship and it would be a waste of taxpayer money to create a new judgeship where it was not needed. The bill died in committee. The district court ascribed bad motive to Judge Ellender's letter, suggesting it was against the

No. 19-30665

32nd JDC's interests since they had previously requested a new judgeship. But Judge Ellender adequately explained why the judgeship was no longer needed. Without evidence proving that racial animus played some part in the Senate Judiciary Committee's decision, the district court had no basis for including the rejection of this bill in its calculus.

In 2001, two separate bills were introduced calling for an additional judgeship in the 32nd JDC and the creation of a majority-minority subdistrict. Both bills were defeated after judges for the 32nd JDC and the Judicial Council opposed the legislation on the basis that an additional judgeship was not needed at the time. As with the other bills, the sole fact that minority advocates of a judicial subdistrict were defeated is alone insufficient to support an inference of discriminatory intent behind the legislature's refusal to pass these pieces of proposed legislation.

The same goes for the other actions scrutinized by the district court— from advocacy to expand the Houma City Court to a proposal to reorganize the method for the election of all five 32nd JDC judges. Each of these actions failed not because of any demonstrated intent to suppress black voters' choices, but because new judgeships were unnecessary and therefore a waste of taxpayer funds. Indeed, at one point there was no courthouse space even available for an additional Houma City Court judge. The district court ignored obvious practical, non-racial concerns about the creation of new judgeships:  if the judges haven't enough to do, the legislature becomes reluctant to support their needs; and for every newly created judgeship, the available but limited public resources threaten to be reduced per capita. The district court also failed to mention Louisiana's substantial linkage interest in its analysis.

The district court's contrary findings did not afford Louisiana's legislature its entitled presumption of good faith, overemphasized speculative, circumstantial evidence, and minimized the testimony of those public officials

directly involved in opposing changes to the 32nd JDC. *Cf. Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1318 (5th Cir. 1991) (upholding a district court's no-discriminatory-intent finding and noting that when decisionmakers testify without invoking the privilege, "the logic of *Arlington Heights* suggests that" such direct evidence is "stronger than the circumstantial evidence proffered by the plaintiffs"). That the court imputed racial motives to the local officials (without substantial basis) and then imputed the local officials' views to the legislature is also of concern. There is no proof that the locals' positions for or against judicial subdistricting must be imputed to the legislators or the legislative committees. These errors leave us with "the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S. Ct. 1504, 1511 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 542 (1948)).

That conviction is only strengthened when we review the district court's assessment of contemporaneous viewpoints. The district court criticized those legislators who argued against redistricting in a piecemeal fashion. The court rebutted that because Louisiana had created subdistricts in piecemeal fashion before, it had no basis to oppose redistricting now. For reasons already explained, this logic is fallacious. The redistricting referenced by the district court resulted either from the *Clark* settlement or from the creation of subdistricts for appellate or lesser courts, none of which decisions eviscerated the state's continued interest in retaining at-large JDC elections.

The district court also found that certain legislators' calls to proceed slowly before enacting subdistricts were pretexts for racial discrimination. Even if individual legislators' statements referenced by the district court were as suspect as the district court perceived, they are entitled to little probative value. The Supreme Court has repeatedly cautioned against overemphasizing statements from individual legislators, which are not necessarily "what

No. 19-30665

motivates scores of others" to act (or, in this case, not act). *O'Brien*, 391 U.S. at 384, 88 S. Ct. at 1683; *see Hunter*, 471 U.S. at 228, 105 S. Ct. at 1920. The plaintiffs offer no evidence that the pleas to proceed cautiously constituted procedural deviations from the normal legislative process or a cover for discrimination. One obvious casualty, were Louisiana to abandon linkage either wholesale or piecemeal, would be the creation of 26 judicial subdistricts for each of the JDC judges in Orleans Parish.

## CONCLUSION

We conclude that the district court clearly erred in its finding of minority vote dilution in the election of judges for Terrebonne Parish's 32nd JDC, principally, but not solely, because the district court did not adequately credit the state's substantial linkage interest. Likewise, we conclude that the district court clearly erred in its finding of discriminatory intent. Because the state is not liable under either Section 2 or the United States Constitution, we **REVERSE** the district court's judgment.

No. 19-30665

STUART KYLE DUNCAN, Circuit Judge, dissenting in part and concurring in the judgment in part:

Regrettably, I am unable to join Judge Jones's well-crafted merits opinion, because I am not persuaded the plaintiffs have Article III standing.

The normal standing requirements of injury-in-fact, traceability, and redressability apply to claims under the Voting Rights Act ("VRA"). *See, e.g.*, *Harding v. Cty. of Dallas*, 948 F.3d 302, 307 (5th Cir. 2020); *OCA-Greater Houston v. Texas*, 867 F.3d 604, 609–14 (5th Cir. 2017); *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 430–31 (5th Cir. 2011). As the majority implicitly concludes, the cognizable injury here is alleged minority vote dilution caused by at-large judicial elections for Louisiana's 32nd Judicial District Court ("JDC"). Where I part ways with the majority, however, is its conclusion that the plaintiffs have shown traceability and redressability for this injury as to the Governor of Louisiana.[1]

The plaintiffs have not shown that the Governor plays any role in administering at-large judicial elections in the 32nd JDC, or judicial elections anywhere else in Louisiana. Consequently, they cannot demonstrate that any injury stemming from this election practice is "fairly traceable" to the Governor, nor that the injury will "likely be redressed" by an order against him. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 561 (1992) (cleaned up).[2]

---

[1] The Governor and Attorney General are the only two state officials remaining in the lawsuit. The majority does not find traceability or redressability as to the Attorney General, but only the Governor.

[2] Plaintiffs point out that the Governor signs the commissions of judges elected in the 32nd JDC, *see* La. Stat. Ann. § 18:513(A)(5), that he must sign legislation before it goes into effect, *see* La. Const. art. III, § 18(A), and that he is empowered to set dates for special elections needed to fill vacancies, *see* LA. CONST. art. V, § 22(B). That begs both standing questions—namely, whether the Governor's exercise of any of these powers caused the plaintiffs' alleged vote-dilution injury, and whether an injunction with respect to any of these powers would likely redress that injury. The answer to both questions is no.

No. 19-30665

*Other* Louisiana officials do have legal duties in judicial elections—such as parish clerks of court, La. Stat. Ann. § 18:422, boards of election supervisors, *id.* § 18:243(B), or commissioners-in-charge, *id.* § 18:424(C). These are the kinds of officials typically sued in voting cases like this one.[3] The plaintiffs could have sued them but did not. They *did* sue the Secretary of State, who is the state's "chief election officer," *id.* § 18:421, and has certain election-related duties, *see id.* §§ 18:421(B)–(D), 18:18.[4] But the plaintiffs dismissed the Secretary, with prejudice, during district court proceedings. I have no idea why the plaintiffs made these litigation choices. But their effect was to dissolve any case or controversy that is the basic premise for federal judicial action. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) ("Article III standing enforces the Constitution's case-or-controversy requirement." (cleaned up)).[5]

---

Although the majority does not address whether the plaintiffs have standing to sue the Attorney General, the plaintiffs' arguments on that point are even worse. For example, they assert that the Attorney General is the chief legal officer of the state, La. Const. art. IV, § 8, that he must give opinions on legal questions when requested by certain officials, La. Stat. Ann. § 49:251, and he represents state interests in election-related litigation, La. Const. art. IV, § 8. None of those duties comes close to establishing traceability or redressability for injuries stemming from at-large judicial elections in the 32nd JDC.

[3] *See, e.g.*, Brief of Respondents in Opposition, *Chisom v. Roemer*, 501 U.S. 380 (1991), 1990 WL 10022952 (secretary of state and commissioner of elections); *Thornburg v. Gingles*, 478 U.S. 30 (1986) (state board of elections, members of the board, secretary of state, and others); *United States v. Mississippi*, 380 U.S. 128 (1965) (state, members of state board of elections commissioners, and county registrars of voters); *Harding*, 948 F.3d 302 (county commissioners and others); *League of United Latin American Citizens, Council No. 4434 v. Clements*, 999 F.2d 831 (5th Cir. 1993) (en banc) (secretary of state, members of the Texas Judicial Districts Board, and others).

[4] None of these state election officials, including the Secretary of State, are subject to the Governor's control.

[5] *Compare Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193, 1207–10 (11th Cir. 2020) (no traceability and redressability for equal protection claim because plaintiffs failed to sue independent officials who administered challenged ballot-ordering law), *with OCA-Greater Houston*, 867 F.3d at 613–14 (finding traceability and redressability in VRA suit because plaintiffs sued Texas Secretary of State, the "chief election officer of the state" who is responsible for maintaining uniformity in state election laws (citations omitted)).

No. 19-30665

Look at it this way. The district court's injunction barred the Governor and Attorney General from "administering, implementing, or conducting" the at-large judicial elections at issue, and demanded they "ensure" future elections would follow the court's remedial plan. Had the plaintiffs ultimately won, would that injunction have likely redressed their injuries? No, because neither the Governor nor the Attorney General has authority to "administer, implement, or conduct" those elections, or to "ensure" how future elections will take place. The order might as well have enjoined the Secretary of the Louisiana Department of Wildlife and Fisheries. "For all practical purposes," that is, the injunction would be "utterly meaningless." *Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (en banc). Indeed, the majority alludes to this problem. It "takes no position" on whether, had the plaintiffs won, "standing would exist and the [district] court could have enforced its remedy without the continued presence of the Secretary of State, who is Louisiana's chief elections officer." Maj. Op at 6 n.5. But that articulates *precisely* the key redressability question and, without answering it, the majority lacks authority to proceed to the merits. *See Singh v. RadioShack Corp.*, 882 F.3d 137, 151 (5th Cir. 2018) ("Standing must be decided at the threshold of every federal case—before a determination on the merits.").[6]

The majority suggests there is something "unique" about this VRA case when it comes to standing, Maj. Op. at 6 n.5, but cites no authority fleshing

---

[6] The plaintiffs cite *Utah v. Evans*, 536 U.S. 452 (2002), involving a challenge to the method of conducting the 2000 national census, but it does not help them. *Utah* held an injunction against the Secretary of Commerce satisfied redressability because "the practical consequence of [a favorable decision] would amount to *a significant increase in the likelihood* that the plaintiff would obtain relief that directly redresses the injury suffered"—namely, a revised census count leading to an additional representative for Utah. *Id.* at 464 (emphasis added). But the plaintiffs have not even met that mark—they point to no evidence suggesting that the injunction entered by the district court would "significant[ly] increase . . . the likelihood" that at-large elections in the 32nd JDC would be conducted differently.

out that proposition. It does point to *United States v. Mississippi*, 380 U.S. 128 (1965), but that falls short. In that case challenging discriminatory voting tests, the plaintiffs sued not only the State of Mississippi, but also "three members of the Mississippi State Board of Election Commissioners, and six county Registrars of Voters"—officials who administered the voting tests at issue. *See id.* at 130, 132–33. As a result, I fail to grasp how *Mississippi* teaches that the normal standing rules of traceability and redressability apply in a "unique" way to a VRA vote-dilution case like this one.

To be sure, *Mississippi* also teaches that the VRA validly abrogates state sovereign immunity as legislation enforcing the 15th Amendment. *See id.* at 140; *see also, e.g.*, *OCA-Greater Houston*, 867 F.3d at 614 (explaining "[t]he VRA . . . validly abrogated state sovereign immunity") (citing *Mixon v. State of Ohio*, 193 F.3d 389, 398–99 (6th Cir. 1999)). For that reason, I have no quarrel with the majority's conclusion that the *Ex parte Young* arguments raised by the Attorney General must fail. *See* Maj. Op. at 6. But that does not solve the traceability or redressability problems, because Article III standing is distinct from *Young*. *See OCA-Greater Houston*, 867 F.3d at 609–14 (treating standing and *Young* as separate questions in VRA case). In other words, even though *Young* might pose no independent obstacle, the plaintiffs may still lack Article III standing because they have "sue[d] the wrong defendant." *Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193, 1209 (11th Cir. 2020).

On this latter question, unfortunately, our precedents do not speak with one voice. On the one hand, we have treated *Young* separately from the traceability and redressability components of standing, most prominently in our *en banc* decision in *Okpalobi v. Foster*, 244 F.3d 405, 426–27 (5th Cir. 2001)

No. 19-30665

(en banc).[7] And we have done so in the VRA context: in *OCA-Greater Houston*, we found traceability and redressability as to the Texas Secretary of State given that official's "enforcement connection" to a challenged Texas election law. *See* 867 F.3d at 613–14 (quoting *Okpalobi*, 244 F.3d at 427). On the other hand, our decision in *Allstate Insurance Co. v. Abbott*, 495 F.3d 151 (5th Cir. 2007), appears to elide *Young* and standing. In that case, involving dormant commerce clause and First Amendment challenges to a Texas law, state officials removed to federal court and thus waived sovereign immunity. *See id.* at 158 n.12. The *Young* "fiction" was therefore irrelevant. *Id.* at 159. But this, we explained, made the suit really "against the state," not the officials, and rendered causation and redressability "eas[y]." *Id.* The "state" obviously caused the plaintiffs' injury by passing the law, and an injunction against the "state" would remedy it. *Id.* at 159–60. No inquiry was made as to the officials' connection to the challenged law.

The majority alludes to *Allstate*, *see* Maj. Op. at 5, but does not squarely rely on it. That is wise, in my view, because extending *Allstate* to the VRA would mean that traceability and redressability would *always* be found *regardless* of which officials were sued. It is hard to believe that is the law, especially because we have recently applied traceability and redressability in VRA cases without mentioning *Allstate*. *See, e.g., Harding*, 948 F.3d at 307; *OCS-Greater Houston*, 867 F.3d at 609–14. Absent any other authority

---

[7] *Compare Okpalobi*, 244 F.3d at 416–19 (plurality op.) (discussing *Young*'s requirement that there be "some connection" between defendant and duty to enforce challenged law), *with id.* at 426–27 (majority op.) (addressing redressability separately and concluding "[t]he governor and attorney general have no power to redress the asserted injuries"); *see also OCA-Greater Houston*, 867 F.3d at 609–14 (treating questions separately).

No. 19-30665

squarely on point, I would rely on the normal standing requirements and find no traceability or redressability as to the Governor.[8]

In sum, given the plaintiffs' lack of Article III standing, I would vacate the injunction and remand with instructions to dismiss the plaintiffs' lawsuit for lack of jurisdiction. *See Hotze v. Burwell*, 784 F.3d 984, 1000 (5th Cir. 2015). I therefore respectfully dissent from the portion of Part I of the majority opinion that concludes the plaintiffs have standing to sue the Governor.

---

[8] The majority suggests it is relevant that "the Governor has been a party defendant in nearly all of Louisiana's voting rights cases challenging judicial districts." Maj. Op. at 5 (citing *Chisom*, 501 U.S. at 384; *Prejean v. Foster*, 83 Fed. App'x 5 (5th Cir. 2003); *Hall v. Louisiana*, 983 F. Supp. 2d 820, 824 (M.D. La. 2013)). I disagree. In each of the cited cases, the plaintiffs also sued the Secretary of State or the Commissioner of Elections, or both. *See* Brief of Respondents in Opposition, *Chisom*, 501 U.S. 380, 1990 WL 10022952 (secretary of state and commissioner of elections); *Prejean*, 83 Fed. App'x 5 (commissioner of elections); Memorandum in Opposition to Motion for Preliminary Injunction, *Hall*, 983 F. Supp. 2d 820, 2013 WL 12308255 (secretary of state). None of these cases stands for the proposition that plaintiffs may sue the Governor alone in VRA cases.

# *United States Court of Appeals*

### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

June 29, 2020

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW

Regarding:  Fifth Circuit Statement on Petitions for Rehearing
            or Rehearing En Banc

     No. 19-30665   Vincent Fusilier, et al v. Piyush Jindal
                    USDC No. 3:14-CV-69

          ----------------------------------------------------
Enclosed is a copy of the court's decision.  The court has entered
judgment under FED. R. APP. P. 36.  (However, the opinion may yet
contain typographical or printing errors which are subject to
correction.)

FED. R. APP. P. 39 through 41, and 5TH CIR. R.s 35, 39, and 41 govern
costs, rehearings, and mandates.  **5TH CIR. R.s 35 and 40 require
you to attach to your petition for panel rehearing or rehearing en
banc an unmarked copy of the court's opinion or order.**  Please
read carefully the Internal Operating Procedures (IOP's) following
FED. R. APP. P. 40 and 5TH CIR. R. 35 for a discussion of when a
rehearing may be appropriate, the legal standards applied and
sanctions which may be imposed if you make a nonmeritorious
petition for rehearing en banc.

Direct Criminal Appeals.  5TH CIR. R. 41 provides that a motion for
a stay of mandate under FED. R. APP. P. 41 will not be granted
simply upon request.  The petition must set forth good cause for
a stay or clearly demonstrate that a substantial question will be
presented to the Supreme Court.  Otherwise, this court may deny
the motion and issue the mandate immediately.

Pro Se Cases.  If you were unsuccessful in the district court
and/or on appeal, and are considering filing a petition for
certiorari in the United States Supreme Court, you do not need to
file a motion for stay of mandate under FED. R. APP. P. 41.  The
issuance of the mandate does not affect the time, or your right,
to file with the Supreme Court.

Court Appointed Counsel.  Court appointed counsel is responsible
for filing petition(s) for rehearing(s) (panel and/or en banc) and
writ(s) of certiorari to the U.S. Supreme Court, unless relieved
of your obligation by court order.  If it is your intention to
file a motion to withdraw as counsel, you should notify your client
promptly, **and advise them of the time limits for filing for
rehearing and certiorari**.  Additionally, you MUST confirm that
this information was given to your client, within the body of your
motion to withdraw as counsel.

The judgment entered provides that plaintiffs-appellees pay to
defendant-appellant the costs on appeal.  A bill of cost form is
available on the court's website www.ca5.uscourts.gov.


                            Sincerely,

                            LYLE W. CAYCE, Clerk


                            By: _____
                            Nancy F. Dolly, Deputy Clerk

Enclosure(s)

Ms. Leah Camille Aden
Mrs. Angelique Duhon Freel
Mr. Phillip Michael Gordon
Mr. William Aaron Lesser
Ms. Elizabeth Baker Murrill
Ms. Janai S. Nelson
Mr. Samuel Spital
Mr. Jason Brett Torchinsky
Ms. Michaele Turnage Young
Mr. Jeffrey M. Wale
Mr. Ronald Lawrence Wilson
Mr. Michael B. de Leeuw